UNITED STATES of America

v.

Michael George THEVIS.

UNITED STATES of America

v.

A. Jeanette EVANS.

Crim. Nos. H–78–73, H–78–66.

United States District Court,
D. Connecticut.

March 30, 1979.

Thomas P. Smith, Asst. U. S. Atty., Richard Blumenthal, U. S. Atty., New Haven, Conn., for plaintiff.

Austin E. Catts, Atlanta, Ga., Raynald B. Cantin, Hartford, Conn., Bobby Lee Cook, Summerville, Ga., Justin J. Donnelly, Bloomfield, Conn., for defendants.

## RULING ON CONSOLIDATED MOTIONS TO SUPPRESS AND TO DISMISS

CLARIE, Chief Judge.

The cases of the defendants Michael George Thevis, one of the FBI's ten most

wanted fugitives, and his traveling companion, Anna Jeanette Evans, have been consolidated solely for the purpose of resolving the present motions. Said defendants have moved the Court to suppress certain statements made by them and evidence seized from them, and to dismiss their indictments.

After conducting a five-day evidentiary hearing, the Court finds that the initial questioning of the defendants and their subsequent arrest and detention were reasonable within the meaning of the Fourth Amendment. The Court does find that certain of the statements made by the defendants to the government agents were obtained in derogation of the defendants' Fifth Amendment rights, but that certain other statements were obtained without any Fifth Amendment violations. Consequently, the defendants' motion to suppress statements made by them is granted in part and denied in part. The Court further finds that all of the searches and seizures of which the defendants complain were reasonable within the meaning of the Fourth Amendment, and accordingly the defendants' motions to suppress the evidence seized are denied. The Court further finds, as a matter of law, that the statements attributed to the defendant Evans in Counts Three and Four of the indictment do not constitute false or fraudulent statements within the meaning of 18 U.S.C. § 1001, and accordingly dismisses those counts. Finally, while agreeing with the defendants that the government agents transgressed not only the Fifth Amendment but also certain FBI regulations in conducting their investigation, the Court concludes that the suppression of statements obtained illegally is sufficient to vindicate the defendants' Constitutional rights. Therefore, the defendants' motion to dismiss the indictments in their entirety is denied.

### Statement of Facts

Separate indictments were handed down by the Grand Jury against the defendants in November 1978. In Criminal Case No. H–78–66, the defendant Evans was charged with harboring an escaped prisoner, 18 U.S.C. § 1072, harboring a fugitive from justice, 18 U.S.C. § 1071, and two counts of making a false statement to an FBI agent, 18 U.S.C. § 1001. Thevis was charged in Criminal Case No. H–78–73 with possession of firearms by a convicted felon, 18 U.S.C. App. § 1202(a)(1), interstate transportation of a firearm by a convicted felon, 18 U.S.C. §§ 922(g) and 924(a), and possession of a fraudulent passport, 18 U.S.C. § 494.

The defendants were apprehended on November 9, 1978 by the FBI and officers of the Bloomfield Police Department. The critical events of that day had been set in motion as early as September 20, 1978, when an individual identifying himself as Arby J. Evans opened a savings account, with an initial cash deposit of $3,000, at the Bloomfield State Bank in Bloomfield, Connecticut. The individual was not in fact, Arby J. Evans, but rather the defendant Michael George Thevis, who at that time was a fugitive from justice, having escaped on April 28, 1978 from federal custody in New Albany, Indiana. On October 13, 1978 the Bloomfield State Bank received through the mail a $30,000 check to be deposited to the account of Arby J. Evans.

Bank personnel considered this transaction unusual in light of the fact that the $30,000 check was a "starter" check (i. e. one that is drawn on a new account and does not bear the imprinted name of the drawer), the large amount of the check, and the fact that the Bloomfield State Bank account had only recently been opened. The transaction was therefore called to the attention of the bank's president, Joseph Gozzo. Upon being apprised of the situation, Gozzo feared that the bank could become the victim of a "checkkiting" operation. There are various known methods of checkkiting. One is to establish a bank account, deposit fraudulent checks, and withdraw the money before there is time for the checks to clear. Another is to open an account in a fraudulent name, deposit stolen forged checks which will clear, and then withdraw the funds from the account. The perpetrators can insure that the checks will clear by stealing them from the middle

or the bottom of their victim's checkbook, which prevents the victim from learning of the theft until his next bank statement arrives in the mail. (Tr. 67). The perpetrators can then plan to make the withdrawal after the stolen forged checks have cleared, but before the victim receives his bank statement at the end of the month. The fact that "Evans" was making a transfer of such a large amount of money from one newly opened account to another newly opened account aroused Gozzo's suspicion enough to cause him to investigate further.

"Evans" had used a North Carolina driver's license as identification in opening the Bloomfield State Bank account, which Gozzo deemed unusual in light of the fact that the starter check was drawn on a South Carolina bank. Gozzo then learned that "Evans" did not live at 19 Hill Farm Road, Bloomfield, which address he had used in opening his Bloomfield State Bank account. Finally, Gozzo was unable to locate a telephone number for Arby J. Evans in Connecticut, North Carolina or South Carolina. His suspicions thoroughly aroused, Gozzo called the Bloomfield Police Department and informed either Deputy Chief Anthony Toce or Officer Thomas Beatty of the cause for his concern. Beatty contacted FBI Agent Richard Foster and asked him to check on the validity of the starter check and the identity of Arby J. Evans. Foster reported back that there was a real Arby J. Evans, who was a respected contractor in Mebane, North Carolina with no known criminal record, and that there were sufficient funds in the South Carolina bank to cover the starter check. This information was in turn relayed to Gozzo, and on October 24, 1978 when the Bloomfield State Bank received payment for the starter check from the drawee bank, the account of Arby J. Evans was credited for the full amount.

On November 8, 1978 Thevis, still posing as Arby J. Evans, entered the Bloomfield State Bank and told vice president Leonard Antcil that he would like to withdraw $31,-000 from his account in 50 and 100 dollar bills at approximately 9:30 the following morning. Antcil told Thevis that the bank

would make a room available to him so that he could count the money. Thevis responded that that would not be necessary, that he would trust the bank's count. He further requested that the money be put in a brown paper bag and that only those absolutely necessary be told about the withdrawal. When Antcil reported this information to Gozzo, the latter became concerned that the person purporting to be Arby J. Evans, might not in fact be the true owner of the funds. He then called the bank's counsel, Attorney David Beizer of the law firm of Rome & Case, for advice. Enroute to lunch, Gozzo and Beizer decided to stop at 19 Hill Farm Road, the given address of the depositor, to learn whether Arby J. Evans in fact lived there. Failing to receive a response to the doorbell, they looked in the mailbox and found mail addressed, not to Evans, but to a party named Rifkind.

Upon his return from lunch Gozzo instructed Antcil to learn what he could about "Evans" from the Post Office. When Antcil reported back that "Evans" had received some correspondence from the Connecticut Bank and Trust Company, Gozzo called that bank and learned that "Evans" was intending to withdraw $55,000 in cash from that bank the following morning. At this point Gozzo contacted Deputy Police Chief Toce and informed him of the foregoing facts. Toce then arranged for Officer Beatty and FBI Agent Foster to meet with him at the bank the following morning to check "Evans" identification. Later that afternoon Gozzo learned from a director of the bank, who happened to live on Hill Farm Road, that Mrs. Rifkind had sold her house to Arby J. Evans. Gozzo relayed this information to Toce either that afternoon or early the following morning. However, no one told Agent Foster of this development. He had previously been told by Officer Beatty that 19 Hill Farm Road was a "phony" address. Agent Foster mistakenly interpreted this to mean that there was no such address. The first time he learned that Thevis had put a downpayment on the house was November 9, 1978, when he questioned Thevis in the bank about his local address. (Tr. 126).

At approximately 9:00 a. m. on November 9, 1978, Toce and Beatty arrived at the bank and were met a few minutes later by Foster. Thevis arrived on schedule between 9:20 and 9:30. He was met by vice-president Antcil, who told Thevis that Gozzo wished to speak with him, and was led to the president's office, where Gozzo and the three law enforcement officers were waiting. At Gozzo's request, Thevis produced identification, including a driver's license and several credit cards in the name of "Arby J. Evans" as well as credit cards bearing the name "A. J. Evans." These latter cards actually belonged to Anna Jeanette Evans and had been given to Thevis prior to his entering the bank.

At that point Gozzo left the room, and Foster introduced himself as an agent of the FBI. Toce and Beatty were introduced as Bloomfield police officers. Upon learning Foster's identity, Thevis exclaimed, "Wow, FBI. Do I need an attorney?" Foster than replied, "Why do you think that you would need an attorney?" Thevis answered, "Well, I expected to see someone from the I.R.S. here, but I'm surprised to see an FBI agent." Foster then told Thevis that he could have an attorney if he wanted one. (Tr. 787–89). Thevis did not ask for an attorney at that time, nor did he express an unwillingness to speak with the officers. Instead he asked Foster if the problem was that the check had not yet cleared. Foster responded that, whether the check had cleared or not, there were questions as to his identity and that the bank wanted to be sure that he was in fact Arby J. Evans.

Thevis protested that he was a reputable businessman and stated that he could not understand why the FBI and the police were concerned about his personal business. Foster explained that he had already made a few telephone calls and had learned that Arby J. Evans was indeed a reputable contractor from Mebane, North Carolina, and that if Thevis could suggest someone from that area who would vouch for his identity, a call could be placed to that individual and Thevis could be on his way. Thevis was unable to suggest anyone he wished to be used as a reference. In a telephone call to the Mebane Police Department Beatty had learned that the real Arby J. Evans was a personal friend of the Mebane town manager, a Mrs. Virginia Whitfield. Foster was apprised of this fact and asked Thevis whether he knew the town manager, to which the latter responded, "I know *him* to see *him* . . . .. We are not close personal friends." (Tr. 129) (emphasis added).

At approximately 9:40 a call was placed to the Mebane town manager in order to afford Thevis an opportunity to speak to her. After exchanging pleasantries for a few moments, Thevis returned the telephone receiver to Beatty who was informed by Mrs. Whitfield that the individual with whom she had just spoken was definitely not the person she knew as Arby J. Evans.

During the conversation at the bank Thevis was asked why he was withdrawing $86,000 in cash from the two banks. He stated that he intended to use some of the money to purchase the house. He declined to reveal his intentions as to the remainder of the money, describing that information as personal and outside the interest of the FBI. In response to further questioning, Thevis stated that his real estate agent had dropped him off at the bank and that he was there alone. Gozzo, who had left the bank to take a look around out of doors, while the officers were interviewing Thevis, telephoned his office to inform the officers that there was a lone female waiting in a car parked in the bank parking lot bearing South Carolina registration plates.

At approximately 9:45 Agent Foster and Beatty, leaving Thevis in the bank with Toce, went out to the parking lot and approached the vehicle, which was parked apart from the other cars in the lot. They approached the vehicle and Anna Jeanette Evans, who was seated in the driver's seat, appeared not to acknowledge their presence until Foster tapped on the window. When she rolled down the window, Foster and Beatty both identified themselves as police officers and displayed their credentials. Foster asked to see her driver's license, and she produced a Georgia license in the name

of Anna Jeanette Evans. Foster, noting the similarity in their names, geography and southern accents, asked Evans what her relationship was to the individual inside the bank. She responded that she was alone at the bank, that she knew no one inside the bank and that she knew no one by the name of Arby J. Evans. Foster pressed further: "Are you sure? Mr. Evans has a bank account in South Carolina and your vehicle has South Carolina license plates and your name is the same as his." (Tr. 139). Evans continued to deny knowing the individual in the bank.

Beatty then asked her for the car's registration, which she could not produce. Foster again mentioned the similarity of the two names, and Evans then admitted knowing the man in the bank. She stated that she had traveled from her home in Atlanta two weeks previously to Charleston, South Carolina for a "fling" and had met him in a saloon there. Foster observed that single people from Charleston might travel to Atlanta for some "action," rather than *vice versa*. Evans then changed her story and claimed that the man in the bank was really her husband of eight years.

At that point Foster, who had previously noticed that the rear seat of the vehicle was loaded with luggage, asked Evans whether the luggage belonged to her. She responded affirmatively. In response to Foster's inquiry, Evans stated that no one else was with her, other than the individual in the bank. Foster than observed that some of the luggage bore the initials "J.E." as well as Eastern Airlines' stick-on type name tags which said "Sally Green." When Foster asked Evans who Sally Green was, Evans stated, "I don't want to answer any more questions at this time." (Tr. 143). Foster then asked Evans to accompany him into the bank, and after locking her car, she complied.

While he was in the bank alone with Thevis, Toce, asked him whether or not he had any further identification. Thevis proffered his wallet, which Toce took and commenced looking at various pieces of identification contained therein. (Tr. 792).

Toce began copying down numbers from the various cards and Thevis eventually took his wallet back, telling Toce he had no right to do that. (Tr. 794).

When Foster, Beatty and Evans entered the bank, Thevis, attempting to give Evans a lead, said, "I'm sorry that I had to involve you as my sister." Evans agreed that she was in fact his sister, but said that she was nervous and had already told the officers that she was his wife. Foster then continued to seek information regarding Anna Jeanette Evans' identification; who she was, her relationship to Arby J. Evans, the names of her children. After about five or ten minutes Thevis asked if they were under arrest. Foster replied that they were not, but that they were not free to leave. (Tr. 660). Foster then announced that it would be necessary for all of them to adjourn to the Bloomfield police station. At approximately 10:00 a. m. the officers and the defendants, leaving the defendants' car in the parking lot, left for the Bloomfield police station, arriving within two or three minutes.

The defendants were questioned at the Bloomfield police station regarding their identity, their purpose in Bloomfield, the source of the money, and their respective places of employment. (Tr. 40). Shortly after arriving at the Bloomfield police station, a second call was placed to Mrs. Whitfield, who provided the home telephone number of Mrs. Arby J. Evans and the names of the children; she also informed the police of a check theft and forgery ring operating in Chapel Hill and Burlington, North Carolina, which is near Mebane.

Mrs. Arby J. Evans was contacted by telephone and told that the FBI and the Bloomfield Police Department were holding two individuals, whom they would like her to help identify. Thevis was then asked if he would like to speak with the real Mrs. Evans, and he responded that he would be delighted to do so. (Tr. 159). After a brief exchange, one of the officers asked Mrs. Evans the identity of the man to whom she had just spoken. She stated that she was too upset to talk and hung up. A telephone

call was later placed to Jimmy Jobe, who had been identified by the Mebane police chief as a close personal friend of Arby J. Evans. Jobe informed Foster that the individual he had spoken with was definitely not Arby J. Evans. (Tr. 51–52).

At approximately 10:20 Thevis stated that he would like to have an attorney. He was referred to the yellow pages of the telephone book and, after several unsuccessful attempts, contacted an attorney who agreed to come to the police station. At approximately 11:00 a. m. Attorney Richard Case of the law firm of Rome & Case arrived and conferred privately with Thevis and Evans for about 45 minutes. He left the police station at 11:45, stating that he would return later with an associate who was more familiar with criminal matters.

From the time Thevis requested the services of an attorney until Case's arrival, neither defendant was questioned. Thevis did volunteer some remarks during that time, but said nothing that was considered significant. During the period 10:20 to 11:45 Foster traced the automobile to a South Carolina dealer, whose sticker was affixed to the outside of the vehicle. Foster learned from the dealer that the car had recently been purchased for cash by an individual identifying himself as "Arby J. Evans." He further learned that "Evans" had requested him to mail the various purchase papers to him in care of Helen Sparks, Post Office Box 7593, Marietta, Georgia.

At about 10:40 Toce telephoned Sergeant Glenn of the Burlington, North Carolina police department, and inquired about the check-kiting scheme which was being perpetrated in and around Burlington. Glenn stated that a man and a woman were involved in one such scheme, and gave descriptions which might well fit Thevis and Evans. The scheme involved a number of different bank accounts, in a fairly complex use of checks, with the perpetrators siphoning off slightly less than that which they had deposited into the account (e. g. withdrawing $31,000 from a $33,000 account). Glenn made arrangements to wire the photographs of these two suspects to Bloom-

field. Attorney Case, upon being informed of these arrangements, agreed that it would be reasonable to detain Thevis and Evans until the photographs arrived.

Attorney Case returned to the police station at about 1:00 p. m. with Attorney Justin Donnelly. During Case's absence neither defendant was questioned. While Thevis did make certain gratuitous remarks, nothing was said which Foster remembers or considered significant. The two attorneys conferred with Thevis and Evans for the next hour without interruption by Foster or the police.

At approximately 1:55 Foster received word from another FBI agent, who had learned of the physical description of the individual claiming to be Arby J. Evans, that this individual might in fact be Michael George Thevis, one of the FBI's ten most wanted fugitives. Procuring a wanted poster from Beatty, Foster entered the room where the two attorneys were conferring with Thevis and Evans and told Thevis that he had a wanted poster in the name Michael George Thevis and that the individual certainly looked like him. Thevis stood up, smiled and said: "Yeah, you got me. I'm Mike Thevis." (Tr. 56). In response to a question from one of the attorneys, Foster read from the wanted poster the charges pending against Thevis. Foster then asked Thevis if he was the person wanted as an escaped federal prisoner in New Albany, Indiana. Thevis replied, "It wasn't much of an escape. They left the back door open and I walked out." (Tr. 57).

Foster, noting on the wanted poster a caution regarding explosive devices, addressed Thevis: "Mike, you understand I'm going to have to search your automobile. Is there anything that's going to hurt me in there? What am I going to find?" Thevis responded simply: "About a half million dollars." Foster rejoined: "That's not what I'm talking about. Is there anything else in the car?" Thevis answered: "About a million in jewelry." Foster continued: "No, I'm talking—I see here on the Wanted flier it says that you have something to do with explosive devices. I'm going to drive this

vehicle in the basement of the Federal Building. Is it going to bring the walls down?" Thevis laughed and said no, there was nothing in the car that would harm anyone. (Tr. 57–58).

Thevis and Evans were then formally placed under arrest. Thevis was temporarily placed in a cell at the police station and Bloomfield police officer Edgar Robinson entered the cell for the purpose of conducting a search of Thevis' person. Prior to doing this officer Robinson advised Thevis of his constitutional rights in the following manner: "You have the right to remain silent. Anything you say can and will be used against you in a court of law. And if you don't have an attorney, one would be furnished you." (Tr. 1143).

Shortly thereafter both defendants were driven in separate cars to the Federal Building in Hartford. Foster had demanded that Thevis give him the keys to his car and another FBI agent drove that vehicle to the Federal Building. While enroute Thevis began to talk about his escape, but Foster cut him short, stating that they would talk about it later. Upon approval at the Federal Building at about 3:40, Thevis was fingerprinted, photographed, and searched. Foster then presented to Thevis an advice of rights and waiver form which Thevis signed, and he orally explained to Thevis his constitutional rights.

Foster then began to question Thevis. In response to this questioning, Thevis related that he was anxious to return to Georgia to clear himself of a Racketeer Influence and Corrupt Organization charge which was pending against him. He also stated that he had nothing to do with the October 25, 1978 slaying of Roger Underhill, a key government witness in that investigation, but that he would not be surprised if the government tried to connect him with that murder. Asked about his escape, Thevis said, "It wasn't really much of an escape. I just walked out the back door and kept going." (Tr. 62). When Foster inquired as to where Thevis had gone since his escape, Thevis indicated a desire to remain silent, and Foster terminated the interview.

Foster then showed Evans an FBI advice of rights form and orally informed her of her Constitutional rights. Evans, protesting that by signing she would be waiving her rights, and refusing to sign anything until the arrival of her attorney, declined to sign the form. (Tr. 1020). This occurred at about 4:25. Foster immediately began to question her about the Roger Underhill slaying. Evans responded: "Look, you've got me on the harboring, I'm guilty of that, but I don't know anything about any killings and I don't want to answer any more questions." (Tr. 65). No further questions were asked of Evans.

### Discussion of the Law

#### 1. Probable Cause to Arrest

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) the Supreme Court made it clear that:

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response." *Adams v. Williams, supra,* 407 U.S. at 145, 92 S.Ct. at 1923.

Although both *Terry* and *Adams* arose in the context of a limited pat down search for weapons, the rationale of those cases is not limited to situations where police officers have reason to believe the individual may be armed. *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The Second Circuit has recognized that:

"[A] law enforcement officer has the power, indeed the obligation, to detain a person temporarily for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed or is about to commit a crime." *United States v. Oates,* 560 F.2d 45, 58–59 (2d Cir. 1977). *See also, Stevens v. Wilson,* 534 F.2d 867, 873 (10th Cir. 1976) (Barrett, J., concurring).

This principle does not give the police a license to detain individuals and question them for no reason at all. Whenever a police officer accosts a person and restrains his ability to walk away, he has seized that individual, rendering the police conduct subject to Fourth Amendment scrutiny. *Terry v. Ohio, supra,* 392 U.S. at 16, 88 S.Ct. 1868. To justify such a seizure, the officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880 (footnote omitted). The Supreme Court has eschewed a talismanic approach in evaluating police-citizen confrontations where there is no probable cause for an arrest; the touchstone, as always in Fourth Amendment analysis, is "the reasonableness in all the circumstances of the particular invasion of a citizen's personal security." The reasonableness of the officers' conduct must be measured by balancing the need for the stop against the gravity of the invasion of personal security entailed by the stop. *United States v. Oates, supra,* 560 F.2d at 59. Factors to be considered in making this assessment include the seriousness of the offense suspected, the probability of the suspect's complicity in the offense, the extent of the intrusion, and the need for prompt action. *United States v. Garcia,* 450 F.Supp. 1020, 1023 (E.D.N.Y.1978).

Applying these principles to the facts of the instant case, the Court finds the officers' response to their suspicions to have been reasonable, in light of all the knowledge possessed by them. The facts known to the officers on the morning of November 9, 1978 when Thevis first entered the bank were certainly sufficient to justify a brief detention for the purpose of establishing his identity. Thevis had transferred $30,000 from one new account to another, a transaction the bank officials considered unusual. The depositor, ostensibly a Georgian, was depositing a check drawn on a South Carolina bank. Foster at the time reasonably believed that Thevis had fabricated a local address and had not been informed of the explanation given for this circumstance.

Most alarming was the fact that the bank customer had asked for the money in 50 and 100 dollar bills in a brown paper bag and that he was willing to accept the money without verifying the amount. Furthermore, he stated that he preferred that the bank vice-president not alert anyone at the bank, other than those absolutely necessary.

The fact that the starter check had cleared was not sufficient to negate any possibility of check-kiting; it was possible that the scheme being employed was one where the stolen check would clear before its owner would realize that it had been stolen. Similarly the fact that the check in question was a starter check did not establish that the funds did not originate with a stolen forged check. It would have been possible for the perpetrators to steal a check, deposit it in a new account in South Carolina and then write a check on that account to be deposited in the Bloomfield bank. Moreover, in light of the peculiar circumstances of the withdrawal, the officers could justifiably entertain a suspicion that the person withdrawing the funds was not in fact Arby J. Evans. That the police were unsure whether a crime was in fact being committed does not render the initial stop unreasonable.

" '[T]here is no war between the Constitution and common sense,' *Mapp v. Ohio,* 367 U.S. 643, 657 [81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081]. Police officers need not wait until they see a person actually commit a crime before they are able to 'seize' that person." *Terry v. Ohio, supra,* 392 U.S. at 35 n. 1, 88 S.Ct. at 1887. (Douglas, J., dissenting).

The officers' first action—asking Thevis to step into the bank president's office in order to confirm his identity—was a very minimal intrusion. *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. 1921; *United States v. Taibe,* 446 F.Supp. 1142, 1146 (E.D.N.Y.1978). The fact that Thevis was asked to enter the office did not transform the investigatory stop into a full arrest. *United States v. Oates, supra,* 560 F.2d at 57; *United States v. Van Lewis,* 409

F.Supp. 535, 545 (E.D.Mich.1976); *United States v. Wylie,* 186 U.S.App.D.C. 231, 239, 569 F.2d 62, 70 (1977), *cert. den.* 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). In attempting to establish Thevis' identity, the officers were not limited to reviewing the documents he offered them. *See United States v. Hall,* 174 U.S.App.D.C. 13, 525 F.2d 857, 860 (1976). It was reasonable to call Mrs. Whitfield, the Mebane town manager, who was reputed to be a personal friend of Arby J. Evans.

■ Nothing in the officers' initial discussion with Evans contravened the Fourth Amendment. In fact, the officers did not "seize" Evans until they asked that she accompany them into the bank. The Supreme Court has recognized that:

> "[N]ot all personal intercourse between the policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879.

The present case is factually similar to *United States v. Wylie, supra,* where an individual was accosted outside a bank and asked to produce identification. The court held that, since the citizen's liberty was not restrained, there was no seizure and therefore the officer's conduct was not subject to scrutiny under the Fourth Amendment. 186 U.S.App.D.C. at 237, 569 F.2d at 68. Likewise the Court finds that neither Foster nor Beatty made any display of physical force or show of authority which restrained Evans' liberty in the bank parking lot.

However, even assuming *arguendo* that the questioning of Evans in the bank parking lot can be deemed a stop for Fourth Amendment purposes, the officers' attempt to seek information from Evans was entirely reasonable. She was seated in a car which was parked at a distance from the others in the parking lot and which bore South Carolina license plates, the same state where the Arby J. Evans' starter check had originated. Once he learned her name, Foster, being aware of the similarity in their initials and last names, their southern accents and the geographical factors, was justified in pressing Evans further on her identity and her relationship to the individual in the bank.

■ Foster and Beatty effected a seizure of Evans when they asked her to step inside the bank with them. It had become clear at that time that she was not free to leave. At the same time, however, she had not been subjected to a full arrest. As with another defendant who was held to have been subjected to a *Terry*-type stop rather than a full arrest, she was "politely requested to accompany the officers to a private room and, without objection, [she] acquiesced in that request." *United States v. Oates, supra,* 560 F.2d at 57. In light of Evans' obvious fabrications—purporting first to be unrelated to Evans, then his girlfriend and then his wife of eight years—and the ambiguity over the ownership of the luggage in the rear seat of the vehicle, the officers' request that she accompany them into the bank was a reasonable attempt to get to the truth.

■ Given the seriousness of the suspected offense—a potential fraud involving $86,000—the specific and articulable facts which prompted their suspicion, and the obvious need for prompt action if a suspected crime were to be prevented, the officers' brief investigatory stop of both defendants for the purpose of establishing their identity was a reasonable intrusion and not violative of the Fourth Amendment. In reaching this conclusion the Court does not suggest that any one of the circumstances present in this case would alone be sufficient to justify the investigatory stop of these individuals. Rather, it is the confluence of all the facts which were known to the officers. " '[T]he circumstances before [the officer] are not to be dissected and viewed singly; rather they must be considered as a whole.' " *United States v. Magda,* 547 F.2d 756, 758 (2d Cir. 1976), *cert. den.* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977), quoting from *United States v. Hall,* 174 U.S.App.D.C. 13, 15, 525 F.2d 857, 859 (1976).

Although the defendants were not formally arrested until later in the afternoon, their arrest was complete for Fourth Amendment purposes when they were transported from the bank to the police station at 10:00. In announcing that police could make a brief investigatory stop even when there was no probable cause to believe that a crime had been committed, the *Terry* Court did not intend that police could circumvent the probable cause requirement completely, transporting an individual to a police station and holding him there for several hours while developing a case upon which to base a full arrest. The question, therefore, is whether the police had probable cause to arrest the defendants at the time the decision was made to transport them to the police station.

 Probable cause must exist at the time of arrest; the officers may not use facts which were learned only after the arrest to establish probable cause. *United States v. Sanudo-Perez,* 564 F.2d 1288, 1291 (9th Cir. 1977). However, where, as here, the officers learn certain facts during a *Terry*-type stop, they may use those facts to support a finding of probable cause to make the subsequent arrest. Finally, it should be noted that probable cause should be assessed in light of the collective, rather than the individual knowledge of the officers involved. *United States v. Rosario,* 543 F.2d 6, 8 (2d Cir. 1976); *United States v. Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir. 1972).

 The standard definition of probable cause comes from the landmark case of *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

"Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that'

an offense has been or is being committed." *Id.* at 175–76, 69 S.Ct. at 1310–1311, quoting from *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

Although an arrest without a warrant must be based on something more than mere suspicion,[1] it is clear that much less evidence is necessary to constitute probable cause to arrest than is required to establish guilt. *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Chaplin,* 427 F.2d 14, 15 (2d Cir. 1970). In applying this standard it is well to remember that:

"In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States, supra,* 338 U.S. at 175, 69 S.Ct. at 1310.

And, as then Circuit Judge, now Chief Justice, Burger has observed:

"The test of probable cause is not what reaction victims—or judges—might have but what the totality of the circumstances means to police officers. Conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *Davis v. United States,* 133 U.S.App.D.C. 167, 169, 409 F.2d 458, 460 (1969), *cert. den.* 359 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969).

██ The Court finds that the facts and circumstances known to the officers in this case were sufficient to warrant their belief that a crime had been or was being committed. In addition to the factors which led to their reasonable investigatory stop of Thevis, which have been outlined above, the officers were aware of the following suspicious circumstances at the time of the arrest. A personal friend of the real Arby J. Evans,

---

1. Of course, an arrest made in the daytime and at a location other than the defendant's home will not be invalidated for failure to procure an arrest warrant, so long as there is probable cause to support the arrest. *Gerstein v. Pugh,* 420 U.S. 103, 113, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *United States v. Rollins,* 522 F.2d 160, 167 (2d Cir. 1975), *cert. den.* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *cf. United States v. Reed,* 572 F.2d 412 (2d Cir. 1978).

after hearing Thevis' voice, had positively stated that he was not Arby J. Evans. Within a period of five to ten minutes Evans had offered three different explanations of her relationship to Thevis and had acquiesced in a fourth story told by Thevis. The officers had also noticed that the initials on the luggage in the rear seat did not correspond to the name tags which had been affixed to the bags. Furthermore, given the coincidence between the first two initials and last names of the individuals, the officers could have surmised that the credit cards bearing the name "A. J. Evans" in fact belonged to Anna Jeanette Evans and were being used by Thevis to establish a false identity.[2]

All of these factors considered together would lead a man of reasonable caution to believe that Thevis was about to defraud either the two banks or the real Arby J. Evans of a total of $86,000.[3] The fact that the officers could not say with certainty which particular crime had been committed or in fact that any crime had been committed does not mandate a finding of no probable cause. *United States v. Carr,* 584 F.2d 612, 619 (2d Cir. 1978); *United States ex rel. Frasier v. Henderson,* 464 F.2d 260, 262 (2d Cir. 1972); *United States v. Unverzagt,* 424 F.2d 396, 399 (8th Cir. 1970). Given the fact that Evans was with Thevis at this time and had lied about her relationship to him, the officers had probable cause to believe that she was a part of the scheme. *See United States v. Mapp,* 476 F.2d 67, 73 (2d Cir. 1973). Her evasiveness and nervousness when she was approached by the officers in the parking lot is another factor which they could properly consider. *United States v. Magda,* 547 F.2d 756, 759 (2d Cir. 1976). There may have

been some lawful explanation for all these suspicious circumstances; however, the police need not be able to negate all possible lawful explanations of a situation before making an arrest. *United States v. Rodriguez,* 532 F.2d 834, 838 (2d Cir. 1976).

The Court does not suggest that any of these factors would be sufficient by itself to establish probable cause. The Second Circuit has recognized that " 'in law as in life, the effect of [considering the evidence as a whole] generally is much greater than of the sum of the parts.' " *Raffone v. Adams,* 468 F.2d 860, 866 (2d Cir. 1972), quoting from *United States v. Bottone,* 365 F.2d 389, 392 (2d Cir. 1966), *cert. den.* 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966). Put in a different way:

"[P]robable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as officers. We weigh not individual layers but the 'laminated' total." *Smith v. United States,* 123 U.S.App.D.C. 202, 206, 358 F.2d 833, 837 (1966) *cert. den.* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967) (Burger, J.).

The continued detention of the defendants at the Bloomfield police station was reasonable, in light of the additional information that the officers received there. The officers learned of a check theft and forgery ring which was operating in the area of Mebane, North Carolina, and they learned that the description of some of the individuals involved fit the defendants. The real Mrs. Arby J. Evans refused to identify Thevis as her husband and another personal friend of Arby J. Evans stated affirmatively that the individual he had

---

**2.** Other suspicious circumstances include the fact that Thevis, after declining to suggest anyone who could vouch for his identity, misidentified the gender of someone who was a personal friend of the real Arby J. Evans and the fact that he had falsely stated that he was alone at the bank. As will be discussed below, these statements were obtained in violation of Thevis' Fifth Amendment rights and the Court accordingly does not consider them in assessing probable cause.

**3.** For reasons which will be discussed below, the Court has decided to dismiss the two counts charging Evans with making false statements to an FBI agent, on the ground that the statements she is alleged to have made do not come within the purview of 18 U.S.C. § 1001. For that reason, the Court rejects the government's argument that the officers had probable cause to arrest the defendants for violations of 18 U.S.C. § 1001.

spoken with on the telephone was definitely not Arby J. Evans. Even Thevis' attorney, Richard Case, conceded at the police station that it would be reasonable to hold the defendants, at least until photographs of the suspects in the check theft and forgery ring had been received by the police. Of course, once the identity of Thevis had been discovered there is no question that there was sufficient reason to detain the defendants.[4]

In short, the Court concludes that neither the initial investigatory stop of the defendants, nor their arrest, nor their subsequent detention constituted a violation of the defendants' Fourth Amendment rights. Rather, "the police conduct at issue here involved a proper progression of escalating responses to circumstances which generated a mounting degree of suspicion that a crime had occurred." *United States v. Wylie, supra,* 186 U.S.App.D.C. at 235, 569 F.2d at 66.[5]

### 2. Admissibility of Defendants' Statements

 The Fifth Amendment to the United States Constitution guarantees that no one can be compelled to be a witness against himself in a criminal prosecution. In order to implement this guarantee the Supreme Court has adopted a prophylactic rule requiring officers to give the defendant certain warnings prior to engaging in custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendants in the present case allege that certain statements made by them were obtained by the government in derogation of these rules, and that the government should therefore be barred from using those statements in court against them, in its case in chief. The

burden of proof is on the government to establish by a fair preponderance of the evidence that the statements were not obtained in violation of the defendants' *Miranda* rights. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

 Even the officers agree that the defendants were not told of their rights until several hours after the officers' initial contact with them. Thevis was first warned by Officer Robinson at the Bloomfield police station at about 3:30 p. m. and Evans was first advised of her rights by Agent Foster at the Federal Building about 4:25 p. m. This does not mean, however, that all statements made by the defendants prior to the warnings are inadmissible. *Miranda* was expressly made applicable only to interrogation which occurs when the defendant is in police custody. *Beckwith v. United States,* 425 U.S. 341, 346, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

Custody has always been defined in terms of the defendant's freedom to leave. *Orozco v. Texas,* 394 U.S. 324, 326–327, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). Specifically the Court has held:

> "[P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' "
> *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

Judge Friendly has wisely counselled that courts should treat the issue of custody objectively, noting that the adoption of a

---

4. The Court recognizes that these factors, which were learned only after the arrest, cannot be relied upon to support the validity of the arrest. They are mentioned only to demonstrate that the continued detention of the defendants was reasonable.

5. Further explication of the *Terry-Adams* rule can be expected when the Supreme Court decides *Michigan v. DeFillipo,* cert. granted —— U.S. ——, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978)

and *Brown v. Texas,* cert. granted —— U.S. ——, 99 S.Ct. 276, 58 L.Ed.2d 255 (1978). Both cases involve the constitutionality of statutes which make it a criminal offense to refuse to provide identification when an individual is stopped by a police officer who has reasonable cause to believe that the individual's behavior warrants further investigation for criminal activity.

subjective test would reduce the question to a "swearing contest[ ] in which officers would regularly maintain their lack of intention to assert power over a suspect save when the circumstances would make such a claim absurd, and defendants would assert with equal regularity that they considered themselves to be significantly deprived of their liberty the minute officers began to inquire of them." *United States v. Hall,* 421 F.2d 540, 544 (2d Cir. 1969), *cert. den.* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). The Second Circuit in that case suggested that the concept of custody "conveys a flavor of some affirmative action by the authorities other than polite interrogation. . . . [I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart." *Id.* at 544–545.

▊ With respect to the defendant Evans, the Court finds that she was not placed in custody for *Miranda* purposes until she was escorted into the bank.[6] There was nothing threatening or coercive in the officers' words or actions when they questioned Evans in the parking lot. Evans herself conceded that the officers were at all times courteous. Since the officers did not in any way restrict Evans' freedom to leave the parking lot, their interrogation of her was not custodial. Consequently, statements which she made there are admissible against her. Once she was requested to enter the bank, however, Evans was in custody. Whether the request was in the form of an invitation or a demand is immaterial;

she was not free to leave at that time. *See United States v. DelSoccorro Castro,* 573 F.2d 213, 215–16 (5th Cir. 1978). Therefore any statements she made in response to police interrogation after that time may not be used against her in the government's case in chief.

Specifically the Court rules that Evans' statement that she is guilty of harboring, but knows nothing of Roger Underhill's killing, must be suppressed. This statement was made in response to a question posed by Foster immediately after he had read Evans her rights and she had refused to sign the waiver form, stating that she would sign nothing until the arrival of her attorney. Foster's persistence in questioning Evans, after her unequivocal announcement that she would stand on her rights and would waive none of them without the presence of counsel, was a clear violation of the *Miranda* Court's direction that:

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 473–74, 86 S.Ct. at 1627–1628 (footnote omitted). *See also United States v. Lewis,* 425 F.Supp. 1166, 1175 (D.Conn.1977).[7]

▊ Evans' statement that she was the sister of Arby J. Evans stands on a different footing. She made this voluntary remark in the bank, in reply to Thevis' suggestive cue. Although Evans was in custody at that time, the statement was not made in response to police interrogation.

---

**6.** It should be noted that "custody" and "arrest" are separate and discrete concepts. One may be in custody for *Miranda* purposes—that is, not free to leave—and still be in a state of detention which rises only to the level of a *Terry* stop, rather than to a full arrest. The Supreme Court in *Morales v. New York,* 396 U.S. 102, 90 S.Ct. 291, 24 L.Ed.2d 299 (1969), by deciding the case on a narrower ground, avoided grappling with the "question of the legality of custodial questioning on less than probable cause for a full-fledged arrest." *Id.* at 105–06, 90 S.Ct. at 293. The issue is presently pending before the Supreme Court in *Dunaway*

*v. New York,* —— U.S. ——, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978).

**7.** Even if there were no Fifth Amendment violation, it is likely that if the issue arose at trial the Court would hold that the probative value of this statement was outweighed by its prejudicial effect. Fed.R.Ev. 403. Since Evans has no legal training, the probative value of her opinion as to whether her actions constituted harboring is dubious at best, and the prejudice which would flow from the admission of such a statement is obvious.

There is no need to give the warnings to one who volunteers information, and therefore that statement is admissible. *Miranda, supra*, 384 U.S. at 478, 86 S.Ct. 1602.

■ With respect to the defendant Thevis, the Court finds that he was in a custody status the moment he was ushered into the bank president's office and the door closed behind him. He was then confronted by three law enforcement officers and questioned in a room which was cut off from the outside world, in an atmosphere which was "police dominated." *Miranda, supra*, 384 U.S. at 445, 86 S.Ct. 1602. Viewing the situation objectively, it seems apparent that the officers would not have honored his request to leave. Consequently, any statements made by Thevis in response to police interrogation after that change of status must be suppressed.

■ However, the telephone conversations Thevis had with Mrs. Whitfield, Jimmy Jobe and Mrs. Arby J. Evans, which were initiated for the purpose of determining whether Thevis was in fact the person he represented himself to be, are not inadmissible. In a long line of decisions, beginning with *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), the Supreme Court has held that the Fifth Amendment prohibits compulsion only of

statements which can be categorized as "testimonial" in nature. Specifically, the Court has held that the defendant may be compelled to use his voice as an identifying characteristic. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). That is all that happened here.[8]

The government argues that the arrival of Attorney Case on the scene cures Foster's earlier failure to warn the defendants as to any statements made by the defendants after his arrival, on the ground that an attorney would naturally inform his clients of their rights.[9] As inviting as this theory may appear, no court has ever gone so far,[10] and the *Miranda* Court itself specified that a defendant's actual knowledge of his rights would not take the place of the warnings. 384 U.S. at 469, 471–72, 86 S.Ct. 1602. In any event, the Court need not rule on this issue, because no statements were made by either defendant, from the time of Case's arrival on the scene, until Thevis' spontaneous admission as to his true identity.

■ This latter statement, even if it can be said that it was made in response to a question from Foster, is clearly admissible. This statement was made in the presence of

8. Extending this "identification" exception too far could swallow up the *Miranda* rule entirely. Thus it might be argued that any questions put to the defendants regarding their occupations and their relationship to one another were meant to aid in identifying them. Cases like *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109 (2d Cir. 1975), *cert. den.* 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976) are distinguishable from the present case. There a rapist had told his victim during the commission of the crime that he had been married 11 years and had two children. Later the defendant, who matched the victim's description of her assailant, was apprehended by the police, who sought basic identifying data prior to giving *Miranda* warnings. During this questioning the defendant revealed that he had been married 11 years and had two children. In holding that this information was not obtained in violation of the defendant's *Miranda* rights, the court emphasized that the questioning was of a non-investigative nature. *Id.* at 1112–13. Similarly, the Supreme Court, upholding, against a

Fifth Amendment challenge, a state statute which required a person who was involved in an automobile accident to give his name and address, noted that the statute's purpose was noncriminal. *California v. Byers*, 402 U.S. 424, 430, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). By contrast, the questioning in this case, even if it related to the defendants' identity, was carried out, not as part of the routine booking procedure, but for investigative purposes.

9. Since the defendants invoked the attorney-client privilege when asked about this, it is not known whether Case did in fact inform Thevis and Evans of their rights.

10. Cases such as *United States v. Falcone*, 544 F.2d 607 (2d Cir. 1976), *cert. den.* 430 U.S. 916, 97 S.Ct. 1329, 51 L.Ed.2d 595 (1977) and *Frohmann v. United States*, 380 F.2d 832 (8th Cir. 1967), *cert. den.* 389 U.S. 976, 88 S.Ct. 478, 19 L.Ed.2d 469 (1967) are distinguishable, in that they involved statements which were made by the defendant in the presence of his counsel.

two attorneys who were representing Thevis. As the Court in *Miranda* recognized: "The presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self-incrimination]. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion." 384 U.S. at 466, 86 S.Ct. at 1623.

*See also United States v. Falcone,* 544 F.2d 607, 610–11 (2d Cir. 1976), *cert. den.* 430 U.S. 916, 97 S.Ct. 1329, 51 L.Ed.2d 595 (1977); *Frohmann v. United States,* 380 F.2d 832, 836 (8th Cir. 1967), *cert. den.* 389 U.S. 976, 88 S.Ct. 478, 19 L.Ed.2d 469 (1967). The other statements made by Thevis at that time, regarding the presence of money and jewelry in the vehicle and his escape from jail, are also admissible under the same theory.

■ The next time any questions were asked of Thevis was after he had been brought to the Federal Building in Hartford. By this time he had been twice given his *Miranda* warnings. However, the mere fact that the warnings were eventually given to Thevis does not necessarily render voluntary any statements made thereafter. Thus in *Westover v. United States,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a companion case to *Miranda,* the defendant was interrogated, kept overnight, and interrogated again the following morning by local police, all without the benefit of any warnings. Then the FBI was called in and the defendant was given warnings, after which he made a confession. The Court held that the giving of warnings alone—after 14 hours of custody—was not sufficient to render the statements voluntary. *Id.* at 494–97, 86 S.Ct. 1602. *Cf. Brown v. Illinois,*

422 U.S. 590, 602–03, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1974). At the same time the fact that the suspect has "let the cat out of the bag" during illegal questioning does not require an automatic finding of involuntariness with respect to statements made after proper warnings are given. *United States v. Lewis, supra,* 425 F.Supp. at 1178. Instead, the court must measure the voluntariness of the later statements considering the totality of all the circumstances, including the fact that the defendant has been subjected to illegal questioning. *Tanner v. Vincent,* 541 F.2d 932, 936 (2d Cir. 1976), *cert. den.* 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782 (1977).

■ Considering the totality of the circumstances in the instant case the Court concludes that Thevis' responses to questioning at the Federal Building were not tainted by the earlier illegal questioning. Thevis had been warned of his rights by two different officers and a significant period of time had elapsed since the illegal questioning, thus affording Thevis an opportunity to reconsider his decision to talk to the officers. *United States v. Lewis, supra,* 425 F.Supp. at 1179. From its own observations at the oral hearing held on the pending motions, the Court found Thevis to be an intelligent, articulate and experienced individual. Indeed, the clearest indication that he understood his right to remain silent was that he invoked the right, first refusing to answer questions in the bank with respect to his purpose in withdrawing the money and later in terminating the interview at the Federal Building. The Court finds that Thevis' decision to respond to questioning at the Federal Building constituted a voluntary, intentional, and knowing waiver of his Fifth Amendment privilege.[11]

---

11. Inasmuch as the defendants have not specified with particularity which statements they seek to suppress, having moved instead to suppress all statements made while they were in custody, the Court will not attempt to catalogue all statements made. Instead the Court holds that all statements made by Evans in response to interrogation after she was in custody and all statements made by Thevis in response to interrogation after he was in custody and before he was given his *Miranda* warnings, are inadmissible against them. Any statements volunteered by either defendant are admissible, as are statements made by Thevis solely for the purpose of identifying his voice, as well as statements made by Thevis in the presence of his counsel.

■ These same factors lead to the conclusion that Thevis had waived his Sixth Amendment right to counsel at the time he answered Foster's questions in the Federal Building. In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court held that the government could not, consistent with the Sixth Amendment, elicit incriminating statements from a criminal defendant after he had been indicted and was represented by counsel. The defendant may waive this right and speak to law enforcement officials without his counsel being present. *Brewer v. Williams,* 430 U.S. 387, 405–06, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The Court finds that the government has sustained its burden of showing that Thevis made an intentional relinquishment of a known right in choosing to answer Foster's questions at the Federal Building. This conclusion is supported by the factors just mentioned as well as by Thevis' knowledge of his right to have an attorney present during any questioning, which was demonstrated by the fact that he made a demand for an attorney within a short time of his arrival at the Bloomfield police station.[12]

### 3. Admissibility of Evidence Seized

■ The defendants seek to suppress evidence seized from them arising out of the following separate searches: the car in which they were traveling, Thevis' wallet, a post office box and two safe deposit boxes.[13] The only items of significance discovered in the inventory of Thevis' wallet included a key to safety deposit box B795 at the C & S Bank in Spartanburg, South Carolina and a South Carolina driver's license bearing the name "Alton Bartlet Hood" and a photograph of Thevis. The government has represented that it does not intend to introduce in its case in chief against Thevis anything seized from Thevis' wallet or from safety deposit box B795. Evans, having no privacy interest in the contents of Thevis' wallet, lacks standing to object to that search. *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Therefore, the Court has no cause to decide whether the search of Thevis' wallet was lawful.

■ The remaining four searches were all conducted pursuant to search warrants issued by a neutral magistrate. Consequently, the Court must assess the sufficiency of the affidavits upon which the warrants were issued. The question is whether the statements within the affidavits on their face [14] establish probable cause to believe that seizable items were present in the locations to be searched. The definition of probable cause is the same whether the context is a search or an arrest. *Spinelli v. United States,* 393 U.S. 410, 417 n.5, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Probable cause exists when the facts and circumstances detailed in the affidavit would war-

12. Since Thevis had not been indicted or otherwise formally charged at the time of the interview in the Hartford Federal Building, it is not clear that his Sixth Amendment right to counsel had yet attached. *Compare United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) with *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (distinguishing between pre-indictment and post-indictment lineups with regard to the right to counsel). In any event, because Thevis waived any right he had, the Court need not reach that question.

Of course, the statements Thevis made in the presence of his counsel, as well as statements which were not made in response to government questioning, do not come within *Massiah's* proscription against eliciting statements from a defendant in the absence of his counsel.

13. Other searches were conducted; however, inasmuch as the government has represented that it does not plan to introduce in its case any evidence seized in these searches, there is no need to consider their legality.

14. Since the defendants have failed to show the existence of any willfully false statements in the warrant affidavits, the Court need not probe beyond the four corners of the affidavits. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Thevis' attorney had announced his intention to demonstrate the falsity of the statement contained in four of the warrant applications to the effect that Thevis had disclosed to Lewis Knight, a fellow prisoner, his plan to escape from jail with the help of Evans. (Tr. 198). Lewis Knight was brought from Atlanta to Hartford pursuant to the defendant's petition for writ of habeas corpus *ad testificandum;* however, he was never called as a witness.

rant a man of reasonable caution in the belief that the items to be seized were located in the place to be searched. *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970).

When the two defendants were transported to the Federal Building, FBI Agent Harrington drove their car to the building. Two agents were then assigned to guard the car until a search warrant could be obtained. When the warrant was executed, the agents found, *inter alia,* seven handguns, approximately $412,000 in cash and a large quantity of jewelry.[15] The affidavit in support of the search of the car is more than sufficient to support the issuance of the warrant. Signed by Agent Foster, the affidavit states that Thevis had been apprehended as an escaped federal prisoner; that he was wanted in Georgia on two counts of murder and four counts of obstruction of justice; that Evans was seated in the car in the bank parking lot; that Thevis had told him that there was half a million dollars in cash and a million and a half dollars' worth of jewelry in the car; and that Thevis had told a fellow prisoner that he was planning to flee the country with the help of Evans, who would provide him with money, false identification and a false passport. Those representations were sufficient to warrant a man of reasonable caution in the belief that money, jewelry, false identification papers, passports, etc., which were sought in the application for the search warrant, would be found in the car.

Moreover, the search would not have been unreasonable, even if a warrant had not been procured. There was probable cause to believe the car contained seizable items, and the vehicle's mobility would have justified an immediate search at the parking lot, to insure that the car would not be moved or any evidence removed from the car. *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). There is no constitutional difference between a search at the parking lot and driving the vehicle back to the Federal Building to be searched. *Id.* at 52, 90 S.Ct. 1975. This course of action was followed by the authorities and approved by the court in *United States v. Pheaster,* 544 F.2d 353 (9th Cir. 1976), *cert. den. sub nom. Inciso v. United States,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977). Furthermore, the search could be justified as an inventory to protect both the defendants' belongings and the police from disputes over lost or stolen property. *South Dakota v. Opperman,* 428 U.S. 364, 372, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Consequently, the Court finds that the search of the car, in which the defendants had been traveling, was lawful.[16]

As to the remaining three searches, the safe deposit boxes and the post office box, the government intends to introduce evidence seized against Evans only; Thevis therefore has no standing to challenge those searches. When conducting a search of safe deposit box 226–03, Trust Company Bank of Cobb County, the FBI discovered, *inter alia,* a passport and a North Carolina driver's license bearing the name Helen Henderson Sparks and a picture of the defendant Evans. The agents seized from Post Office Box 7593, Marietta, Georgia, two envelopes, one of them addressed to "Arbie Evans, c/o Helen Sparks, P.O. Box 7593, Marietta, Georgia." The affidavits in support of the two warrant applications are nearly identical. Both contain the following representations:

1. Thevis, who had escaped from federal custody on April 28, 1978, was arrested in Hartford in the company of Evans;

---

**15.** Thevis, through his counsel, claims that the agents' accounting of the cash is short by approximately $150,000. The Court will conduct a hearing on this issue after the trials of the two individuals have been completed.

**16.** The recent case of *Delaware v. Prouse,* —— U.S. ——, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) does not alter this conclusion. The Supreme Court in that case was dealing with a random stop of a vehicle, where there was no indication whatsoever that its occupants had been involved in illegal activity. By contrast the agents in the present case had ample cause to believe that the defendants had been engaged in illegal activity at the time the car was searched.

2. Leon Walters had testified under oath in the United States District Court in Atlanta, Georgia, that he knew from his own knowledge that Evans was a long-time friend of Thevis;

3. Roger Dean Underhill had told FBI agents that Evans was a long-time girlfriend and trusted associate of Thevis and that Thevis trusted her to the extent of giving her the key to his money and entrusting to her sums of up to $300,000;

4. In the course of investigating Thevis' escape, FBI agents learned that Evans had been on Thevis' approved visitors list and that within the 10 days prior to his escape a total of 11 telephone calls had been placed from the jail where Thevis was incarcerated to the unlisted personal telephone as well as to the listed business telephone of Evans. These calls were charged to the credit card of Robert Eugene Smith, a long-time Thevis lawyer and to a credit card listed in the name Global Industries, Inc., a corporation controlled by Thevis;

5. Lewis Knight, who had been a fellow inmate of Thevis, told FBI agents that Thevis had told him that Thevis' girlfriend was arranging to obtain a false passport and to procure substantial sums of cash, in order to facilitate his escape. Knight could not recall the last name of Thevis' girlfriend, but remembered that her first name was Jeanette and that she was a real estate broker. FBI agent William Whitley, who signed the warrant affidavit, stated that he knew from his own knowledge that Evans had been licensed to sell real estate for some years;

6. Roger Underhill had told FBI agents that he had seen Evans at the airport in Marietta, Georgia. Upon investigation, airport personnel revealed that Evans had purchased a ticket to Hartford, Connecticut.

7. A search of the car in which Evans and Thevis had been traveling at the time of their arrest in Bloomfield produced, *inter alia*, five handguns and a large quantity of cash estimated at approximately $450,000; and

8. At the time of his arrest Thevis was using the alias Arby J. Evans.

█ The affidavit for the search of the post office box also states that Post Office Box 7593 is rented to Evans and the affidavit for the safe deposit box states safe deposit box 226–03 is rented to Evans. The affidavit for the post office box contains the additional allegations that the defendants' car had been purchased in the name of Arby J. Evans with the purchase papers sent to Helen Sparks, Post Office Box 7593, Marietta, Georgia, and that FBI agent Foster had told Whitley that a post office box had been located which had been established by Thevis under an alias to be used as a mail drop, i. e. a location at which Thevis could receive documents and records through the mail with some degree of anonymity.[17]

In assessing the sufficiency of these warrants, it is well to recognize the preference given to a search conducted pursuant to a warrant signed by a magistrate. The Supreme Court has admonished that "the resolution of doubtful or marginal cases in this area should be largely determined by the

17. The affidavits contain certain other representations. Because some of this information may have been obtained in violation of the defendants' Constitutional rights and because the remaining representations are sufficient to establish probable cause, the Court will not consider the possibly tainted information. It is clear that inclusion of tainted allegations in the warrant application will not invalidate the search if the untainted allegations standing by themselves establish probable cause. *United States v. Giordano*, 416 U.S. 505, 556, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., concurring and dissenting); *United States v. Lucarz*, 430 F.2d 1051, 1054 (9th Cir. 1970).

The Court does not decide whether the other allegations contained in the affidavits are in fact tainted. Moreover, it should be noted that whether the excision of tainted allegations in a warrant application is required is still an open question. In *Massachusetts v. White*, —— U.S. ——, 99 S.Ct. 712, 58 L.Ed.2d 519 (1979) certiorari was granted on the issue of whether statements elicited in violation of a person's Fifth Amendment rights may be used to establish probable cause to support a search. The Court's affirmance by an equally divided Court has no precedential value. *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 109 (2d Cir. 1978).

preference to be accorded to warrants." *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). The question then is whether the warrant applications provide a "substantial basis" for the magistrate to conclude, that seizable items were "probably present" in the post office box and the safe deposit box. *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The Court concludes that there was a substantial basis here.

■ The papers connected with the sale of the car which Thevis had purchased while he was a fugitive would be potential evidence in a prosecution against Evans for harboring a fugitive. Therefore the mere fact that the papers had been forwarded to the post office box would itself justify the search of that box.

■ With respect to the safe deposit box, the fact that Evans, a trusted associate of Thevis, was attempting to procure a false passport and a substantial amount of cash to facilitate Thevis' escape, which allegation was partially corroborated by the apprehension of Evans with Thevis in a car containing a large amount of cash, would permit the inference that she may also be concealing identification papers and other such documents in her safe deposit box for Thevis. That there is no direct connection between the safe deposit box and seizable items is not dispositive. It has been held that "the nexus between the items to be seized and the place to be searched [need not] rest on direct observation, [but may be based on] the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [the items.]" *United States v. Lucarz, supra,* 430 F.2d at 1055. *See also United States v. Spearman,* 532 F.2d 132, 133 (9th Cir. 1976); *United States v. Archer,* 355 F.Supp. 981, 991 (S.D.N.Y. 1972), *rev'd on other grounds* 486 F.2d 670 (2d Cir. 1973).

Searches of safe deposit boxes have been sustained on much less evidence than was presented to the magistrate in this case. For example, in *United States v. Gonzalez,* 488 F.2d 833 (2d Cir. 1973), the court with scant discussion ruled that, since there was probable cause to arrest the defendant for a narcotics violation, there was probable cause to search his safe deposit box. *Id.* at 838. Similarly, the mere fact that a defendant had been arrested for engaging in a gambling enterprise was by itself sufficient to warrant a search of a safe deposit box rented by his wife and daughter. *United States v. Mfrs. Nat. Bank of Detroit,* 536 F.2d 699, 702 (6th Cir. 1976), *cert. den. sub nom. Wingate v. United States,* 429 U.S. 1039, 97 S.Ct. 735, 50 L.Ed.2d 749 (1976). The Court finds that the searches of the post office box and of the safe deposit box conformed to the dictates of the Fourth Amendment.

■ The final search of which Evans complains is the search of safe deposit box B795 at the C & S bank in Spartanburg, South Carolina, which was rented to Jeanette Evans and "Bart Hood." Approximately $200,000 in $100 bills was found there. The application in support of that search contained many of the same allegations contained in the other warrant applications, including the statements about Thevis' and Evans' close relationship, the telephone calls placed from the jail to Evans' home, and Thevis' revelation to Lewis Knight that his girlfriend would procure a false passport and a substantial sum of money to help him escape. The application further states that the search of Thevis' wallet uncovered a driver's license bearing Thevis' picture and the alias Alton Bartlet Hood, and a key to safe deposit box B795.[18] A man of reasonable caution would certainly be justified in believing that money, false passports and other false identification papers would be likely to be found in a safe deposit box which Thevis had established in

---

18. As with the post office box and the other safe deposit box, there are other allegations contained in the warrant application, which the Court has not considered in assessing the adequacy of the application. *See* footnote 11, *supra.*

a fictitious name, the key to which box was found in his possession. The Court therefore concludes that the search of safe deposit box B795 was reasonable within the purview of the Fourth Amendment.

#### 4. The False Statement Counts

 Counts three and four of the indictment against Evans charge her with violating 18 U.S.C. § 1001, which provides:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Specifically the indictment charges that Evans falsely stated that she did not know and was not with the individual who identified himself to Foster as Arby J. Evans, and that she had falsely stated that the individual was in fact Arby J. Evans and that he was her husband.

While the language of the statute, if read literally, would make virtually any false statement to a government employee punishable as a felony, the courts with near unanimity have excluded from the statute's sweeping language unsworn, oral, false exculpatory responses to questions posed by investigative agents. *See United States v. Chevoor*, 526 F.2d 178, 183 (1st Cir. 1975), cert. den. 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976) and cases there cited. This "exculpatory no" doctrine is grounded in part in the legislative history of 18 U.S.C. § 1001. That history is recounted in *United States v. Bramblett*, 348 U.S. 503, 504–08, 75 S.Ct. 504, 99 L.Ed. 594 (1955) and *United States v. Gilliland*, 312 U.S. 86, 93–95, 61 S.Ct. 518, 85 L.Ed. 598 (1941) and will not be repeated in detail here. Originally intended to proscribe the making of fraudulent claims for money against the govern-

ment, the statute was amended in 1934 "to embrace false and fraudulent statements or representations where these were knowingly used in documents or affidavits 'in any matter within the jurisdiction of any department or agency of the United States.' In this, there was no restriction to cases involving pecuniary loss to the government. The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland, supra*, 312 U.S. at 93, 61 S.Ct. at 522. The section was reworded in 1948 without substantive change. *United States v. Bramblett, supra*, 348 U.S. at 508, 75 S.Ct. 504.

A case similar on its facts to the present case is *United States v. Bedore*, 455 F.2d 1109 (9th Cir. 1972). An FBI agent had gone to the defendant's home for the purpose of serving a subpoena on him. When the defendant answered the door the agent stated his purpose and asked the defendant's name. The defendant falsely stated that his name was "Halstead." Such a statement was held not to come within the proscription of § 1001. *Id.* at 1111. Similarly, it has been held that a false response to FBI agents concerning the use of an alias was not a false statement within the meaning of § 1001. *United States v. Davey*, 155 F.Supp. 175, 178 (S.D.N.Y.1957).

 Other courts have noted the unfairness that could result from applying § 1001 to false exculpatory responses given to questions posed by FBI agents. The defendant, since he is not under oath and since no transcription of the interview is made, will often be unaware of the danger that a false answer could lead to a criminal prosecution. *United States v. Ehrlichman*, 379 F.Supp. 291, 291–92 (D.D.C.1974), aff'd 178 U.S.App.D.C. 144, 546 F.2d 910 (1976), cert. den. 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977). Permitting § 1001 to be used where the person is speaking informally with an FBI agent "would undermine the safeguards that are normally provided in perjury prosecutions, primarily the for-

mality of the oath, while permitting sanctions as great as those under perjury statutes." *United States v. Chevoor, supra*, 526 F.2d at 183. The individual might then be forced to prepare a defense based on the agent's notes, which do not purport to be a verbatim transcription of either the questions posed or the answers given. *United States v. IBM*, 415 F.Supp. 668, 672 n.14 (S.D.N.Y.1976).

In the two cases in which the "exculpatory no" doctrine was presented to the Second Circuit, the court expressly declined to rule on whether it would follow the majority rule. Thus in *United States v. McCue*, 301 F.2d 452 (2d Cir. 1962), *cert. den.* 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962), the court stated:

"The case of the citizen who replies to the policeman with an 'exculpatory "no"'' can be left until it arises. It is sufficient for the present to point out that the case at bar bears no resemblance to such a situation. Here the appellants voluntarily appeared before three representatives of the Treasury under circumstances in which they were well aware of the nature and purpose of the examination. They were accompanied by counsel and they were questioned under oath." *Id.* at 455 (citations omitted).

Likewise, in holding that the defendant who had made a false report to the FBI concerning the criminal activity of another was properly charged with a violation of § 1001, the court noted that "the 'exculpatory no' cases are readily distinguishable from this case where appellant made an affirmative, voluntary statement deliberately intended to provoke agency action." *United States v. Adler*, 380 F.2d 917, 922 (2d Cir. 1967), *cert. den.* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967).

The question therefore is an open one in this Circuit, and this Court is persuaded by the arguments made in the cases cited above that the statute should not be construed as broadly as the government suggests. The defendant Evans' motion to dismiss counts three and four of the indictment is therefore granted.

### 5. Dismissal Under the Court's Supervisory Power

■ The defendants argue that the Court should, in the exercise of its supervisory powers, dismiss the indictment because of Agent Foster's improper conduct in the course of this investigation. Undoubtedly the Court possesses the power to dismiss the indictments, even in instances where the government's lapses do not rise to a Constitutional level. *United States v. Jacobs*, 547 F.2d 772, 775 (2d Cir. 1976), *cert. dismissed* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978); *United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir. 1972). However, the Second Circuit has recently admonished that "the drastic remedy of dismissal" should be utilized "only in very limited and extreme circumstances." *United States v. Broward*, 594 F.2d 345, 351 (2d Cir. 1979). It has been suggested that this drastic remedy should be reserved primarily for two types of cases: (1) where the need to eliminate prejudice to the criminal defendant cannot be achieved through the imposition of lesser sanctions and (2) to deter "widespread or continuous official misconduct." *United States v. Fields*, 592 F.2d 638, 648 (1978).[19]

■ The defendants' assertion that Agent Foster violated their Fifth Amendment rights and disregarded FBI regulations cannot be refuted. Foster admitted

---

**19.** Further light on the issue of what sanctions are appropriate for a government agency's failure to follow its own procedures can be expected when the Supreme Court decides *United States v. Caceres*, 545 F.2d 1182 (9th Cir. 1976), *cert. granted*, 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1978). That case presents the question of whether the failure to follow internal I.R.S. procedures in the course of an investigation, which procedures are not mandated by the Constitution, justifies the suppression of evidence so obtained. It is interesting to note that the Ninth Circuit's opinion appears to invite reversal. The court, noting that suppression of evidence in such a case is "a questionable approach," felt bound by the ruling of *United States v. Sourapas*, 515 F.2d 295 (9th Cir. 1975), "[a]bsent a contrary ruling by the Supreme Court or by this court en banc." *Id.* at 1187.

that Thevis and Evans were both questioned for several hours without the benefit of *Miranda* warnings, and the Court has held that this questioning was carried out in a custodial setting. Moreover, the failure to give *Miranda* warnings was not inadvertent. Foster himself conceded that it is his practice to warn an individual only when he has grounds to believe that the individual has committed some specific crime. (Tr. 147). This practice, which would permit an agent to subject a person to custodial questioning until he has elicited enough information from him to cause the agent to believe that the individual is involved with a specific crime, flies in the face of the clear direction of the *Miranda* Court that the warnings be given *whenever* an individual is questioned in a custodial setting.[20] Foster also conceded that, in spite of the FBI regulation which requires 302 reports of interviews to be dictated within five working days of the interview, he delayed until December 20, 1978 to dictate his report of the interviews conducted on November 9, 1978. Foster could offer no explanation for this departure from standard FBI procedure. (Tr. 469–70). Finally, Agent Foster incorrectly told Evans that her signature on the FBI's standard advice of rights and waiver form would only signify that she understood her rights, when in fact the plain language of the form states that, by signing it, the individual is waiving his or her rights.[21] (Tr. 365, 1020).

Foster's transgressions do not warrant the extreme sanction of dismissal. Any prejudice which may have accrued to the defendants due to the Fifth Amendment violations is eliminated by the Court's sup-pression of all statements so obtained. The defendants have not demonstrated any prejudice resulting from the delay in dictating the 302 report. To the extent that any prejudice might result, it can be eliminated through calling the delay to the attention of the jury and permitting the jury to assess what effect it has on Foster's ability to clearly recall the events of November 9, 1978. The fact that Evans refused to sign the waiver form indicates that Foster's misrepresentation as to its contents caused her no prejudice. There is also no indication that any of the three practices is so widespread or continuous as to warrant dismissal under the second prong of the *Fields* test.

The Court's reluctance to dismiss the indictment should not be read as an endorsement of the agent's lapses. While his investigative work in apprehending one of the FBI's ten most wanted fugitives should not be denigrated, it must always be remembered that:

"Those whose duty it is to enforce the law must obey the law themselves. Violations such as those in this case are at best short-sighted. Their immediate effect may be to jeopardize investigations and prosecutions which otherwise might be fruitful. The ultimate, and more serious, effect is a loss of public respect for the law and law enforcement agencies." *United States v. D'Angiolillo*, 340 F.2d 453, 456 (2d Cir. 1965), *cert. den.* 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965).

The Court's interest in having investigations conducted lawfully is sufficiently vindicated here by the Court's decision to suppress all evidence obtained in violation of the Fifth Amendment. The defendants'

---

**20.** It should be noted that *Miranda* changed the time at which a defendant's rights attach. In *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) the Court had held that the right to counsel attached when the investigation had "focused on the accused." *Id.* at 492, 84 S.Ct. 1758. The *Miranda* Court, however, defining custody as any significant deprivation of freedom, stated that custodial interrogation is what the *Escobedo* Court meant by an investigation "focused on the accused." 384 U.S. at 444 n.4, 86 S.Ct. 1602 at n.4.

**21.** After delineating the defendant's *Miranda* rights, and directly above the interviewee's signature line, the form provides:

*"WAIVER OF RIGHTS*

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and I know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

motion to dismiss the indictments is accordingly denied.

SO ORDERED.